IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

STACEY HANKINS,

     Plaintiff,

v.

TITLE MAX OF ALABAMA, INC.,

     Defendant.

    CIVIL ACTION NO.
      05-AR-00905-S

## MEMORANDUM OPINION

Before this court is the motion of defendant, Title Max of Alabama, Inc. ("Title Max"), for summary against plaintiff, Stacey Hankins ("Hankins"). Hankins is suing Title Max, her former employer, seeking declaratory judgment, equitable relief, and money damages. She filed her complaint on April 29, 2005, alleging race and gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-5, *et seq.*, and 42 U.S.C. § 1981. Further, she claims wage discrimination on the basis of sex in violation of the Equal Pay Act of 1963, 209 U.S.C. 206(d) and, finally, she claims improper withholding of overtime pay in contravention of the Fair Labor Standards Act, 29 U.S.C. 201 *et seq.* The court's jurisdiction over these claims is based on 28 U.S.C. 1331, 1343, 2201, and 2202. Title Max contends that no genuine issue of material fact exists and it is entitled to judgment as a matter of law with respect to

1

all claims brought by Hankins.  For the reasons that follow, Title Max's motion is due to be granted in part and denied in part.

### I. Statement of Pertinent Undisputed Facts[1]

Stacey Hawkins is a black female who was hired by Title Max as an assistant manager in February 2003.  At the time she filed her complaint, she was still in the employment of Title Max.  Title Max, Inc., is the Alabama subsidiary of Title Max, Inc., a corporation that, though affiliated entities, operates approximately 150 stores in the Southeast.  Title Max is in the "title loan/pawn" business.[2]  This court previously described Title Max's business thus:

> [Its] sole business is to lend money against a person's automobile title.  Title Max  has locations in Alabama, Georgia, Tennessee, and South Carolina.  The operations in each state are run as a separate umbrella; for example Title Max of Alabama is the subsidiary here involved. . . . Title Max is divided into five regions, each region with twenty

---

[1] Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In assessing whether the movant has met its burden, the court must view the evidence, and all inferences drawn therefrom, in the light most favorable to the non-movant.  *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993).  In accordance with this standard, the following statement of facts includes both undisputed facts and the facts according to the plaintiff's evidence, where there is a dispute.

[2] On the Title Max website, the "title loan/pawn" business is characterized as "a quick and convenient way for someone, who owns their car without any liens, to get cash using their car as collateral.  It allows consumers to use an asset they own (their car) to solve short-term cash flow problems without having to sell their car." See *www.titlemx.biz/FAQ.aspx*.

districts.   Each region has a regional manager, and each
district has a district manager.   The manager operates the
individual store, answering to the district manager, then the
regional manager . . . . District Managers cover a least ten
stores.

*Bosch v. Title Max, Inc.*, 2005 WL 357411 at *1 (N.D. Ala.).

In January 2003, Hankins interviewed with Title Max and
accepted a position with the company as an assistant manager at the
company's Green Springs location.   She was one of two assistant
managers at the Green Springs store, which was managed by Sean
Palmedo, the store manager.   Hankins was hired at a initial wage of
ten dollars per hour, or $20,800 per year.   It is undisputed that,
at the time of her hiring, Hankins did not negotiate for a higher
wage.

As an assistant manager, Hankins' duties included a variety of
substantive and administrative tasks, including doing title pawns,
making loans, and collecting on collateral from defaulting debtors.
In addition, she was responsible for cleaning the store and making
up spreadsheets at the end of the day.   In early July of 2003,
less that six months after beginning as an assistant manager,
Hankins requested and received a raise and a promotion.   She was
transferred to Title Max's Fairfield location as an overstaff
manager, at an hourly wage of $12.50 per hour, or $26,000 per year.
In her deposition, Hankins testified that her duties at the
Fairfield location remained essentially the same.   She was also
eligible for bonuses calculated as a percentage of store profits.

Hankins remained at the Fairfield location for the remainder

of the year.  In January 2004, she was promoted to store manager and placed in charge of the Five Points location in Birmingham. The depositions of several Title Max employees indicate that this was a period of expansion for the company, and a number of new stores were being opened.  The Five Points store was a newer store, which, according to Hankins, was not as "established" as, and had "lower volumes" than, other stores.  As the manager of the Five Points store, Hankins was paid $28,000 per year, the highest salary of any of the four other store managers in the district.  Hankins's deposition testimony indicates that she was happy to be assigned to the Five Points store because it was close to her home.

On August 19, 2004, Hankins filed a charge with the EEOC against Title Max and received her right to sue on February 16, 2005.  After receiving her right to sue, she continued as store manager at the Five Points location.  On April 21, 2005, over 8 months after filing her EEOC charge, Hankins was removed from her position as store manager, demoted to assistant manager and re-assigned to another store location.  However, even after the demotion, she continued to receive the same salary.  Shortly after her demotion, Hankins initiated this action.

## II. Analysis:

### A) Equal Pay Act:

Hankins bases her Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), claim on both the wage determination made by Title Max at the time

4

of her hiring and, subsequently, the salary she received after each of her promotions, which, she alleges, was less than was received by similarly situated male employees.

Title Max offers multiple grounds for its request for summary judgment on Hankins's EPA claims. First, Title Max seeks dismissal on the grounds that all claims arising from wage determinations made prior to May 2, 2003 are barred by the applicable two year statute of limitations. Next, Title Max contends that even if the EPA claims are not time barred, they must fail as a matter of law because Hankins has not established and cannot establish a *prima facie* claim under the EPA. Finally, even if Hankins could establish a viable EPA claim, Title Max would rebut the claim by establishing that any difference in pay between Hankins and similarly situated male employees was based on a factor or factors other than sex.

Because this court agrees with Title Max that the statute of limitations acts as a complete bar to claims accruing before May 2, 2003, it will grant summary judgment in favor of Title Max on these claims. As for the claims accruing after May 2, 2003, the court must respectively explore Title Max's other proffered absolute defenses.

The EPA, a portion of the Fair Labor Standards Act of 1963, prohibits employers from engaging in gender-based discrimination when setting employees' rates of pay. A violation of the EPA

occurs when an employer pays lower wages to an employee of one gender than to substantially equivalent employees of the opposite gender in similar circumstances and under similar conditions. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 92 S. Ct. 2223, 2228 (1974).  Unlike Title VII (which applies to a variety of discriminatory employment practices), the EPA applies only to gender-based claims and is strictly limited to cases of unequal pay.

    *(a) Statute of Limitations:*

A claim based on the EPA is subject to the strict statute of limitations found in 29 U.S.C. § 255.  An employee seeking to bring a claim under the EPA must do so within two years from the date the cause of action accrued.  The limitation found in § 255 contains an exception for instances in which defendant's violation was willful.  In such cases, the statute of limitations is extended to three years.  Id.  See *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S. Ct. 1677 (1988).

It is uncontested that Hankins was hired on February 17, 2003, and it is partially on the basis of the initial wage at time of hire that Hankins brings her claims, which were not filed until April 29, 2005, more than two years after her hiring.  The statute of limitations clearly bars the claims based on wages paid before May 2, 2003.

In a footnote to her brief, Hankins raises the possibility

6

that Title Max's conduct was willful and therefore subject to a three year statute of limitations. "Willful" conduct, for purposes of the EPA, occurs when "the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [EPA]." *Richland Shoe*, 486 U.S. at 133. Further, willful conduct is that which is "voluntary, deliberate, intentional, and not merely negligent." Id. Hankins offers absolutely no evidence to support a finding of willfulness in this case. Furthermore, this court's examination of the record indicates that Title Max behaved in good faith with respect to its protected employees. Title Max employed numerous black and female managers at all levels. These employees were compensated similarly to their white or male counterparts. Simply put, there is ample evidence to support the conclusion that Title Max employed blacks and females under fair terms. If Hankins was in fact discriminated against, this court cannot conclude that Title Max did so with any gender discriminatory intent. Therefore, the three year statute of limitations period is inapplicable.

(*b*) *Hankins's EPA Claims:*

If a claim is timely filed, a plaintiff, in order to establish a *prima facie* case under the EPA, must meet the "fairly strict standard of proving that she performed substantially similar work for less pay." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518. See also, *Corning Glass Works*, 417 U.S. at 195. To

establish a *prima facie* case, a plaintiff must show by a preponderance of the evidence that (1) she was paid less than a male employee by the same employer; (2) for equal work requiring equal skill and effort; (3) which was performed under similar conditions. *Hunt v. Nebraska Public Power Dist.*, 282 F.3d 1021 (8th Cir. 2002). Once the plaintiff has established a *prima facie* case, a defendant employer may avoid liability by proving, by a preponderance of the evidence, *Irby v. Bittick*, 44 F.3d 949 (11th Cir. 1995) (quoting *Mulhall v. Advanced Sec., Inc.*, 19 F.3d 586, 590 (11th Cir. 1994)), that any difference in pay is justified by one of the four affirmative defenses found in the text of the EPA. 29 U.S. § 206(d)(1). The four affirmative defenses are absolute if the defendant can show that any difference in pay is due to (1) a seniority system, (2) a merit system, (3) a system which measures earnings by quality or quantity of production, or 4) a differential based on any factor other than sex. Id. In making such a showing, the defendant must establish that "the factor of sex provided *no basis* for the wage differential." *Mulhall*, 19 F.3d at 590 (quoting *Gosa v. Bryce Hospital*, 780 F.2d 917, 918 (11th Cir. 1986)) (emphasis in original). Should the defendant be unable to meet this burden of proof, the plaintiff is entitled to summary judgment. *Miranda*, 975 F.2d at 1533 ("If the defendant fails, the plaintiff wins."). Hankins has not sought summary judgment.

If the defendant successfully establishes that the basis for

the divergent rate of pay falls under one of the four statutory defenses, the burden then shifts once more to the plaintiff, who must rebut the defendant's proffered justification with "affirmative evidence that [the proffered reason] is pretextual or offered as a post-event justification for a gender-based differential." *Irby*, 44 F.3d 949 (citing *Schwartz v. Florida Board of Regents*, 954 F.2d 620, 623 (11th Cir. 1991)). This court's determination that an employer's conduct falls within one of the four statutory defenses is a finding of fact "and will not be reversed on appeal unless clearly erroneous." *Schwartz v. Florida Board of Regents*, 954 F.2d 620, 623 (11th Cir. 1991).

During her tenure at Title Max, Hankins held each of the company's three managerial positions: assistant manager, overstaff manager, and store manager. Of the many management employees employed by Title Max, at all levels, employees were both male and female, white and black. At Title Max, Hankins was paid both more and less than other managers of both races and both sexes. At times, she made more than white males employees, and sometimes less. The same can be said of Hankins with respect to black female employees. To put it more succinctly, there is no correlation that this court can discern between Hankins's race and gender and her wage at Title Max.

Rather than attempting to prove a pattern or practice of gender discrimination on the part of Title Max, Hankins bases her

claim on the simple fact that a cognizable claim under the EPA need only assert that a female employee earns less than at least one similarly situated male employee.   Even as this court is unconvinced by many of Hankins's claims of discrimination, it is nevertheless forced to concede that some of her claims get past summary judgment.

       1. Assistant Manager:

Hankins has a timely EPA claim for her wages earned as an assistant manager during the period between May 2, 2003 and July 7, 2003.   Under the EPA framework discussed above, to establish a *prima facie* case for wage discrimination, Hankins must show that she was paid a lower salary as an assistant manager than a male or males performing substantially similar work.

Title Max argues that Hankins cannot establish a *prima facie* case of wage discrimination because she cannot point to a similarly situated male employee.   According to Title Max, because each manager had different levels of training and experience and performed different duties under different conditions, they cannot be characterized as being "similarly situated."   Title Max also asserts that individual stores were in various states of development during 2003 and that it is therefore impossible to compare the duties of individual managers.

Title Max's arguments are unpersuasive.   The Plaintiff in an EPA case need not prove that her job was identical to those of her

comparators.   Instead, she must show that the two positions are "substantially similar." *Miranda*, 975 F.2d at 1533; *Mulhall*, 19 F.3d at 592.   Even accepting the contention that the individual stores were in various stages of development, Title Max offers no evidence to establish any substantive difference between various assistant manager positions.   As an assistant and overstaff manager, Hankins's job was sufficiently similar to the other more highly paid male managers to establish a *prima facie* case under the EPA.   As an assistant manager, Hankins's initial salary was $20,800 per year.   Title Max claims that this was the salary routinely offered to newly employed assistant managers with the same level of qualifications and experience as Hankins.   Whether this is true or not, it is an undisputed fact that several male assistant managers were hired at a higher salary than Hankins.   Some, admittedly, were hired many months after Hankins, and their higher starting salary may reflect a more competitive labor market or his higher qualifications, factors not addressed by Title Max.   However, it is undisputed that at least one other male (Wayne Jackson) was hired at a higher salary the same week as Hankins.   Hankins, therefore, has established a *prima facie* claim with respect to her salary as an assistant manager for the period between May 2, 2003 and July 7, 2003.

In order to avoid liability, Title Max must prove, by a preponderance of the evidence, that the wage disparity falls under

one of the four affirmative defenses.  29 U.S.C. § 206(d)(1); *Corning Glass Works*, 417 U.S. 188 (1974).  Of the four possible affirmative defenses, only one is applicable here; namely that the pay disparity was based on "any factor other than sex."  Id.  The statutory exemptions are to be construed narrowly against the employer.  *Arnold v. Ben Kanowsky Inc.*, 361 U.S. 388, 392, 80 S. Ct. 453, 456 (1960).  In other words, "the burden to prove these affirmative defenses is heavy and must demonstrate that the factor of sex provided *no basis* for the wage differential."  *Sterger v. General Elec. Co.*, 318 F. 3d 1066, 1078 (11th Cir. 2003) (quoting *Irby*, 44 F.3d at 954) (internal quotations and citations omitted) (emphasis in original).  To fit into one of the four exceptions, Title Max must show that the exception is rationally and systematically applied equally to members of both sexes.  *Marshall v. Aetna Insurance Co.*, 487 F. Supp 717 (E.D. Va 1977).  Finally, Title Max must show that none of its decision-makers, whether in middle or upper management, were influenced by gender bias.  *Sterger*, 318 F.3d at 1078 (internal citations omitted).

Starting with the last element first, this court finds that no credible evidence has been presented suggesting any bias on the part of Title Max decision-makers.  Indeed, the evidence is quite to the contrary.  In an attempt to establish such bias, Hankins cleverly parses a statement made by Dave Deal relating to another company's allegedly discriminatory employment practices.

Specifically, she testified that Deal spoke with her about a
company which frequently hired female employees because that
employer was able to pay them less than men.  Hankins does not
allege that Title Max employed such a policy or that Deal even
agrees with it.  Instead, she asks this court to construe his
characterization of another company's policies as implicit evidence
of Deal's own and Title Max's bias.  This court will not engage in
such unsupported conjecture when Deal's comments, even as
characterized by Hankins, offer no basis for drawing such an
inference.  Furthermore, in his declaration, Deal offered a
perfectly plausible explanation for his comments.  In support of
her argument, Hankins directs this court, via a mistaken citation,
to the Eleventh Circuit's decision in *Thompkins v. Morris Brown
College*, 752 F.2d 558 (11th Cir. 1985).  In that case, plaintiff's
incontroverted testimony established her supervisor's direct bias.
The comments at issue in *Thompkins* were made directly to the
plaintiff and formed the basis for the employment decision in
question.  *Thompkins*, 752 F.3d at 561.  As such, they bear little
resemblance to the comments made by Deal.  This is a strikingly
weak argument from Hankins and she would have done better to leave
it out entirely.

In an attempt to establish its affirmative defense, Title Max
offers three specific factors upon which Hankins's salary was based
and which justify paying her less than a male assistant manager:

(1) her experience and ability; (2) the needs of the business; and (3) whether Hankins negotiated her starting salary or merely accepted Title Max's initial offer. Keeping in mind the heavy burden that must be satisfied by Title Max, this court will evaluate each proffered justification in turn.

Before coming to Title Max, Hankins worked for a number of years at Aaron Rents, a furniture rental and leasing business. While there, she gained significant experience in the rent-to-own industry and rose to the position of general manager at her store. Such experience seems a relevant factor to consider when setting her initial salary at Title Max. Title Max has offered no evidence to show that male employees were more experienced or more accomplished than Hankins and does not attempt to explain how her four years of experience correlate with her starting salary. Therefore, this court concludes that Title Max's first proffered justification does not establish a defense under the EPA.

The second basis, the needs of the business, is simply too amorphous to meet Title Max's burden. Title Max makes no effort to show the particular business needs that were satisfied by setting Hankins's salary as it did. If, for example, it could show that it hired her under budgetary constraints, it might be able to satisfy the burden to show a "factor other than sex." Instead, Title Max simply invokes "business needs" as a talisman, sufficient in and of itself to justify their actions. Without more specificity, this

court finds this justification insufficient to establish the defense.

Title Max's third proffered justification is stronger. It is entirely plausible that an employer may be willing to pay an employee a better wage if, but only if, that employee asks for it. It is incontroverted that Hankins did not attempt to negotiate when hired. What is in dispute, though, is whether Hankins was given the opportunity to negotiate. Hankins claims that she was told that all new employees started at $10 per hour and she simply acquiesced.

Whether or not Hankins's failure to negotiate her initial salary provides sufficient legal justification for Title Max to claim an affirmative defense is a close question. Ultimately, this court finds that, viewing the evidence in the light most favorable to the non-moving party, Title Max has not satisfied the heavy burden to establish, by a preponderance of the evidence, that Hankins's salary as an assistant manager was based on a factor other than sex. Therefore, this court finds that Title Max's motion for summary judgment must be denied as it relates to Hankins's timely claims with respect to her salary as an assistant manager.

2. Overstaff Manager:

Hankins's next EPA claim is based on her salary as an overstaff manager, a position she occupied after her promotion on

July 7, 2003.  As one of six overstaff managers in her district, Hankins was paid $26,000 per year.  This was equal to the salary of two other overstaff managers in her district, both of whom were men.  Of the three overstaff managers whose salaries were higher than Hankins, all three are black and two are women.  Hankins's claim, therefore, must be based on the salary paid to this single, similarly situated male, Derrick D. Chiles.  Mr. Chiles, who was running his own store at the time[3], albeit with the title of overstaff manager, made $28,000 per year.

As discussed above, in order to establish a *prima facie* case under the EPA, a plaintiff must show that she is being paid less than a similarly situated male for equivalent work.  Just as before, this court looks to the substance of the job, not the title given to the employee.  Because Mr. Chiles is charged with the management of his own store, it is clear that his job is not sufficiently similar to Hankins's to support a claim based on the EPA.  This conclusion is supported by the fact, discussed immediately below, that Hankins herself would soon be paid $28,000 per year, after her promotion to store manager.

    3. Store Manager:

Hankins's final EPA claim is based on her salary as a store manager.  On January 1, 2004, Hankins was promoted to the manager

---

[3] This is asserted in Title Max's brief, and not contested by Hankins.

of the Five Points store, a relatively new store. It is undisputed that Hankins was (with Mr. Maurice Gallery) the highest paid store manager in her district, with a salary of $28,000 a year. Hankins asserts that such a distinction is meaningless because an overstaff manager was actually making more than she. However, Hankins offers no evidence to establish that her job was sufficiently similar to this particular overstaff manager's to support an EPA claim. Under *Miranda*, the plaintiff's burden is a strict one that must be established by a preponderance of the evidence. Without this evidentiary showing, this court is satisfied that as the highest paid store manager in her district, Hankins cannot make a cognizable claim under the EPA.

Even if this court were convinced that Hankins has a viable *prima facie* claim, Title Max has offered sufficient evidence to establish that any pay disparity was based on factors other than sex. Title Max contends that she was managing a relatively new store and had no experience as a store manager. These are clearly legitimate factors, other than sex, upon which to base a compensation decision. Furthermore, they are both incontrovertibly true. Hankins had never before run a Title Max store and the Five Points store was, in fact, relatively new. Hankins, however, asserts that these legitimate reasons are "clearly pretextual" because other employees without such experience were paid more in overstaff positions. Many of these employees negotiated for their

17

salary when hired, and many had past rent-to-own experience.  This evidence does not, however, support a finding of pretextuality.

Hankins argues that because this court must view the evidence in the light most favorable to the plaintiff, it must agree with her that because some newly hired senior employees made between $0 and $2,000 more than she, Title Max's proffered justifications are clearly pretextual.  In this, she is mistaken.  In whatever light this court views the evidence, Hankins has not offered affirmative evidence of pretextuality.  Asking this court to draw its own conclusions from a handful of other hires does not negate the sufficiency of Title Max's showing that its wage decisions with respect to Hankins were based on factors other than sex.  In other words, Hankins is asking this court to do her work for her.  Whatever evidence she did offer must be viewed favorably by this court.  But, instead of offering any further evidence, she simply points to similarly situated males earning a higher wage.  This would be sufficient to establish a *prima facie* case, but not to rebut Title Max's established affirmative defense.  Therefore, this court will grant Title Max's motion for summary judgment on all claims arising from Hankins's employment as a store manager.

## B) Fair Labor Standards Act:

The Fair Labor Standards Act establishes a general presumption that entitles all workers to time-and-a-half overtime pay for hours worked in excess of forty per week.  *Falken v. Glynn County,*

18

*Georgia*, 197 F.3d 1341 (11th Cir. 1999) (citing 29 U.S.C. § 207(a)(1)).  The statute exempts, however, from the maximum hour requirement "any employee employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. 213(a)(1). *Jastremski v. Safeco Ins. Companies*, 243 F. Supp. 2d 743 (N.D. Ohio 2003).  To avoid liability under the FLSA, a defendant must establish that the plaintiff/employee falls into one of these exempted categories.

Hankins claims that as both an assistant and overstaff manager, she worked in excess of forty hours per week and received no overtime compensation for her efforts.  According to Hankins, because neither the assistant or overstaff manager positions met the definition for exemption under the FLSA, she was wrongfully denied overtime compensation.  Title Max asserts that Hankins's FLSA claim must fail as a matter of law for two reasons.  First, Hankins has made a sworn statement acknowledging that, as an assistant manager, she never worked more than forty hours per week. Second, with respect to Hankins's claims as an overstaff manager, hers was an administrative position, and therefore exempt under the statute.

Title Max's only basis for contesting Hankins's FLSA claims related to her employment as an assistant manager is the affidavit she signed in February, 2004.  The affidavit, given after Hankins's promotion, states, "[w]hile I was an assistant manager, I was paid

for 86 hours every two weeks but usually only worked 34 hours per week.  I do not recall *ever* working over 40 hours per week." (emphasis added).  Having ostensibly recovered her memory, Hankins now claims in deposition testimony that the affidavit incorrectly states her work history.  Title Max argues that Hankins's deposition testimony is a sham and that this court should grant summary judgment based on the discrepancy with her early sworn statement.  Hankins acknowledges the discrepancy but claims it is relevant only when weighing the evidence and that it is not a basis for summary judgment.

Under Rule 56, this court must render summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" show that there is no genuine issue of material fact.  Fed. R. Civ. P. 56(c).  The issue to be resolved, then, is whether the court should consider as dispositive a previous sworn statement by the plaintiff which conflicts with her earlier testimony.  Resolving this question presents a not uncommon but nevertheless thorny issue regarding the legal standard for summary judgment.

Although issues of credibility are generally left for determination at trial, a district court can ignore testimony in which the non-moving party contradicts their previous, sworn testimony to prevent summary judgment.  In other words, a party cannot manufacture her own issue of material fact by offering

20

contradictory or conflicting testimony.  Permitting this tactic
would "undercut the very purpose of the summary judgment motion—to
weed out unfounded claims, specious denials, and sham defenses."
*OmniSource Corp. v. NCM Americas, Inc.* 313 F. Supp. 2d 880, 890
n.13 (N.D. Ind. 2004) (internal quotations and citations omitted).
Every circuit has held that such so-called "sham" testimony does
not create a genuine issue of material fact sufficient to survive
summary judgment.    See, e.g., *Melanson v. Browning-Ferris
Industries, Inc.*, 281 F.3d 272, 283 (1st Cir. 2002); *Maxwell v.
City of New York*, 380 F.3d 106 (2d Cir. 2004) *opinion supplement*
108 Fed. Appx. 10 (2d Cir. 2004); *Baer v. Chase*, 392 F.3d 609 (3d
Cir. 2004); *Tippens v. Celotex Corp.* 805 F.2d 949, 953-54 (11th
Cir. 1984) (citing *Van T. Junkins and Associates v. U.S.
Industries*, 736 F.2d 656 (11th Cir. 1984)).

Sham testimony usually appears in the form of an affidavit
presented to the court by the non-moving party after a motion for
summary judgment has been made.   Typically, the affidavit
contradicts the proffering party's deposition testimony in an
attempt to create a question of fact.  An interesting wrinkle in
this case is that the testimony is reversed; it is Hankins's
deposition testimony that contradicts her earlier affidavit.[4]
Although mindful that deposition testimony, given its adversarial

---

[4] In this, the present case is similar to the case at issue
in *Tippens*.  805 F.2d 949, 954 n.6 (11th Cir. 1986).

nature, may be of greater reliability, *Darnell v. Target Stores*, 16 F.3d 174 (7th Cir. 1994), this court finds that the exclusion of sham testimony is appropriate in any case where earlier sworn testimony is subsequently conflicted. *Shahzade v. Gregory*, 930 F. Supp. 673 (D. Mass. 1996) (holding that plaintiff's "affidavits and depositions. . . could not be used to contradict previous statements made by the plaintiff *under oath* in order to create a material issue of fact) (internal quotations and citations omitted) (emphasis added).

Hankins contends that, even faced with her contradictory testimony, this court should nevertheless deny Title Max's motion for summary judgment. In support of this argument, Hankins directs this court to the Eleventh Circuit's opinion in *Tippens.* In *Tippens*, the Eleventh Circuit discussed the differences between "discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Tippens*, 805 F.2d at 953. There, the court noted that to allow "every failure of memory or variation in a witness's testimony" to be excluded as a sham would improperly remove determinations of credibility from the trier of fact. Id. at 953-54. Hankins argues that in light of the jury's role in resolving questions of credibility, this court should disregard prior testimony only where a party has give "clear answers to unambiguous questions which negate the existence of a genuine issue of material

fact."  Id. at 953-54.

Applying these principles to the present case, this court finds that Hankins's subsequent testimony is patently inconsistent with her prior testimony.  She offers as an explanation for her conflicting testimony, the unsupported assertion that she informed the drafter of the affidavit that she had in fact worked more than 40 hours per week but that she was nevertheless forced to sign by her boss, Sean Palmedo.  Under normal circumstances, Hankins's declaration would create a contested, material fact and summary judgment would be inappropriate.  Fed. R. Civ. P. 56(c) However, where an explanation is insufficient to justify the later testimony, it is still appropriate for this court to ignore it. *RSBI Aerospace v. Affiliated FM Ins. Co.*, 49 F.3d 399 (8th Cir. 1995) (holding that a purported "misunderstanding" was an insufficient explanation); *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991) (noting that a nonmovant's testimony may be ignored where it conflicts with earlier sworn testimony and  is "without specific explanation"). See also *Solaia Technology LLC v. ArvinMeritor, Inc.*, 361 F. Supp 2d 797 (N.D. Ill. 1997) (noting that a party's testimony which contradicts prior sworn testimony will not be admitted unless the contradiction could be explained or resolved).  The court finds that Hankins's proffered explanation for her testimony is insufficient.  Therefore, this court will ignore the subsequent inconsistent testimony.

23

In her declaration, signed when she was a store manager herself, Hankins claims that (1) she did in fact work more than 40 hours per week at the Green Springs store location; (2) she told the woman who prepared the affidavit that she did work more than 40 hours but was incorrectly told that she was not eligible; and finally (3) she only signed the affidavit because Sean Palmetto [sic], her district manager, instructed her to do so.[5]

Hankins's contentions are implausible and are supported by neither evidence nor inferences that can reasonably be drawn from the evidence.   In other words, the contents of her declaration appear to be calculated to create a genuine issue of fact.   This court basis this conclusion on its survey of the evidence in the record, including the deposition testimony of Hankins herself.

During her time at Title Max, Hankins never hesitated to complain.  She testified that she contacted her supervisors because she was underpaid and because of inappropriate statements made by her co-workers.   Bizarrely, Hankins even complained to her supervisors when she loaned money to a colleague who had been embezzling from   Title Max.  Her colleague used the money to reimburse the company and Hankins was frustrated that, once the money was returned, Title Max did not give it back to her. Hankins, clearly, is no shrinking violet when it came to making her

---

[5] This court assumes that Hankins is referring to <u>Shawn Palmedo</u>.  Hankins seems unable to spell either Mr. Palmedo's given name or his surname.

24

grievances known.  When aggrieved, she complained.  Moreover, she testified that, after voicing her concerns, the problem was often solved.

Her testimony also addresses the tensions between her and Palmedo.  Among the sources of friction between the two were Palmedo's exceedingly strange political beliefs and his anger with Hankins over using non-Title Max and non-bonded contractors to repossess cars.  Indeed, she testified that she "feared my job" [sic].  Given her willingness to sound off when dissatisfied and her free discussion of the problems between herself and Palmedo, it is very puzzling that she omitted any mention of the affidavit from her testimony.  If, in fact, Palmedo forced her to sign a sworn statement against her will why was the incident not mentioned anywhere in her deposition testimony?  Presumably, forcing an employee to commit perjury would be high on any litigant's list of actionable conduct.  It would unquestionably have given her reason to fear for her job, yet she remained silent.  Even more telling is that Hankins omits Palmedo's conduct from her complaint.  Hankins alleges Palmedo's conduct only when she must do so in order to avoid summary judgment on the part of her claim that is not barred by the statute of limitations. To this court, at least, this is not a sufficient explanation.  Therefore, because Hankins's sole factual basis for her FLSA claim relating to her work as assistant manager is directly contradicted by her previously sworn affidavit,

summary judgment on this claim is appropriate.

Title Max also seeks summary judgment on Hankins's claim for overtime earned as an overstaff manager. According to Title Max, while employed as an overstaff manager, Hankins was not legally entitled to overtime. Under the FLSA, employees who are employed in a bona fide executive, administrative, or professional capacity and are paid on a salary basis are exempt. 29 U.S.C. § 213(a)(1). Title Max says that Hankins clearly meets the definition of an administrative employee. Hankins offers testimony to the effect that her duties as an overstaff manager remained nearly identical to her duties as an assistant manager. This court, then, must decide if Hankins was exempt as an overstaff manager.

The burden is on Title Max to demonstrate that the administrative exemption applies to Hankins. *Atlanta Professional Firefighters Union, Local 134 v. City of Atlanta*, 920 F.2d 800 (11th Cir. 1991). Exemptions under the FLSA are construed narrowly against the employer. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). Where an employee makes more than $250 per week, the regulations provide for a "short" or "streamline" test for determining whether an employee is exempt for purposes of the FLSA. 29 C.F.R. § 541.2. Because it is uncontested that Hankins earns at least $250 per week during her tenure at Title Max, this court applies the short test articulated by the regulations.

Under the short test, an employee is exempt if his or her primary duties were "office or non-manual work directly related to management policies of general business operation of his employer or his employer's customers and he uses discretion and independent judgment in his work."  Id.  It is clear to this court that Hankins's duties at Title Max were "office or non-manual work." Although Hankins and other Title Max managers may have, on occasion, been forced to perform a manual task, the business of Title Max, and the business conducted by Hankins, is the making of loans.  Therefore, only the last two elements of the "short test" are in dispute.

To establish that the exemption applies, Title Max must first show that Hankins's duties were "directly related to management policies or general business operations."  29 C.F.R. § 541.2.  In support of its position, Title Max directs this court to its opinion in *Bosch v. Title Max*, 2005 WL 357411 (N.D. Ala.).  As this court stated in *Bosch*, "there does not appear to be one clear test for this portion of the duties test, and several different approaches have been employed."  Id at. *5.  Title Max, seeming to concede that it cannot establish that Hankins was exempt under *Bosch*, nevertheless asserts that her duties were sufficiently managerial to merit exemption.[6]  In this, Title Max fails.  Title

---

[6] Title Max states in its Reply brief:
"Plaintiff's contention that she was not exempt because merely because [*sic*] her duties purportedly did not fit

27

Max seems to imply that the standards used by this court in *Bosch* were optional, or of its own making.  In fact, this is far from the truth.  In *Bosch*, this court applied the tests used in the federal courts to determine whether or not an employee was exempt under the FLSA.  If Title Max fails under the standard employed in *Bosch*, it has no legal basis for claiming that Hankins was exempt.  This court finds that under none of the tests recognized by the federal courts does Hankins's work appear to be directly related to "management policies or general business operations."

One common test calls upon the court to determine whether the primary duty of the employee is management.  Under the federal regulations, an employee's primary duty may be the duty he/she performs more than fifty percent of the time.  29 C.F.R. §541.103. In *Bosch,* this court questioned the utility of this test, noting that a detailed analysis of the percentage break down "seems a useless, and, indeed, senseless endeavor in light of the inherent overlap between management duties and non-management duties that inheres in cases where there is a serious dispute over whether an

_____

the duties portion of the short test set forth in *Bosch* lacks merit.  As this Court stated in *Bosch*, 'there does not appear to be one clear test for this position of the duties test, and several different approaches have been employed.'  Thus, **that Plaintiff's duties may not have satisfied the test set forth is [*sic*] *Bosch* is not fatal to Defendant's argument that Plaintiff was exempt**."

employee is exempt from overtime restrictions." *Bosch*, at *5. While this court's criticism of the percentage analysis has not abated, this is a particularly easy case in which to apply it. In his statement of her job descriptions, Dave Deal, Title Max's regional manager, stated that as overstaff manager, Hankins "should be able to oversee and manage store operations **in the absence of the Store Manager**." (emphasis added). Her other duties included, assisting in the opening and closing of the store and in the general business of Title Max. Given that it was Title Max's policy to have a store manager in each store, it is unlikely that a majority of Hankins's time was spent in management duties.

Another path of inquiry is to ask whether Hankins's managerial duties constituted the principal value her employer placed on her. *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1115 (9th Cir. 2001); *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990). It seems clear that the real value of Hankins to her employer was her efforts in the core business operations of Title Max. From this court's review of the record, there is no uncontested evidence which suggests that her role to Title Max was more valuable as a manager. The precise nature of Hankins's duties as an overstaff manager are in some dispute. Although characterizing her as a "management trainee," Title Max gave Hankins no special responsibilities. She was not the highest ranking employee at her store, and other than filling in for the store manager, had duties

29

that were identical, or at least nearly so, to an assistant manager. Title Max asserts that she was charged with preparing the Five Points store for its opening. Hankins says otherwise. Neither side, however, has proffered any evidence on this matter. Because this court finds that Hankins's employment was not "directly related" to the management policies and general business operations of Title, it is unable to grant Title Max's motion for summary judgment with respect her FLSA claims related to her employment as overstaff manager.

**C) Title VII - Race & Gender Discrimination:**

Hankins also brings suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (as amended), alleging employment discrimination based on her sex and race. The court cannot tell whether Hankins is, in addition to her alternative claim of race or sex discrimination, claiming intentional discrimination against her because of her membership in the protected group of black females. This lack of precision in pleading always leads to trouble.

There are three theories of intentional discrimination that are actionable under Title VII: (1) disparate treatment discrimination; (2) disparate impact discrimination; and (3) a pattern or practice of discrimination, also known as a hostile work environment claim. *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263 (11th Cir. 2000). In this case, Hankins makes only a disparate

treatment claim.  The gravamen of her claim is that, as a black female, she was paid less than her white, male counterparts in substantially similar jobs.  "It is well settled that alleged adverse employment practices such as failure to promote, failure to compensate adequately, undesirable work transfers, and denial of preferred job assignments are considered discrete acts." *Benjamin v. Brookhaven Science Associates, LLC*, 387 F. Supp. 2d 146, 153 (E.D.N.Y. 2005).

Title Max offers two defenses to Hankins's Title VII claims. First, Title Max argues that all claims, except one, are barred because Hankins filed her charge with the EEOC more than 180 days after the allegedly discriminatory conduct occurred.  In the alternative, Title Max asserts that even if such claims are timely, they nevertheless fail as a matter of law.  This court agrees with Title Max that the majority of Hankin's Title VII claims are time barred.  Moreover, on the single claim that was timely filed, this court finds that Hankins has not established that Title Max's proffered justifications for the apparent disparate treatment were pretextual.  Therefore, summary judgment is appropriate on this claim.

In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061 (2002), the Supreme Court addressed the filing requirements related to two types of Title VII claims: (1) disparate treatment and retaliation claims challenging discrete

31

discriminatory or retaliatory acts; and (2) a claim alleging a hostile work environment.  In *Morgan*, the Supreme Court held that where a disparate act occurs outside the 180 day limitation period, that act was without legal consequence and any claims based on that act were time barred.  Here, Hankins, unquestionably bringing a disparate treatment claim, must first file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  *City of Hialeah v. Rojas*, 311 F.3d 1096, 1102 (11th Cir. 2002).  Only those practices complained of in a timely complaint can form the basis for Title VII liability.  Id.  An unlawful discriminatory practice which is not complained of in a timely filed EEOC charge is "merely an unfortunate event in history which has no present legal consequences."  *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S. Ct. 1885, 1889 (1977).  In Alabama, a non-deferral state, to be timely, the applicable charge must have been filed within 180 days after the alleged unlawful employment practice occurred.  42 U.S.C. § 2000e-5(e)(1).  In other words, in Alabama, "only those practices that occurred within 180 days of the operative EEOC charge can form the basis for Title VII liability." *Ledbetter v. Goodyear Tire and Rubber Company, Inc.*, 421 F.3d 1169, 1178 (11th Cir. 2005).

In the instant case, Hankins filed her charge with the EEOC on August 19, 2004.  For this suit to be timely, the allegedly discriminatory conduct must have occurred **after** February 21, 2004.

Hankins claims disparate treatment with respect to an alleged pay disparity, an alleged promotion denial, and an alleged assignment to a less profitable store. All of these alleged acts of disparate treatment occurred before the 180 day period began, and are, therefore, not timely.

Hankins's first claim of disparate pay is based on the initial wage she received as a newly hired assistant manager, in February, 2003. This alleged conduct, occurring over a year before the start of the 180 day period, is barred. Her next claim is based on her promotion to overstaff manager and the wage she received in that position. Her promotion occurred on July 7, 2003 and this claim is also well outside of the limitation period. Hankins's promotion to store manager, and her assignment to an allegedly less profitable store occurred on January 1, 2004. Again, this claim is barred. Obviously, any claim for failure to promote to store manager must also be barred given that Hankins was actually promoted before the limitation period began.

In her reply brief, Hankins argues in a footnote that because she has presented evidence that she was denied a raise shortly before her EEOC charge was filed, her sex discrimination claims are timely under the Eleventh Circuit's opinion in *Ledbetter*. The precise contours of Hankins's footnoted argument are unclear and she declined to elaborate on her citation of *Ledbetter*. This court is reluctant to address what can only be characterized as an

33

implicit argument.  However, because any reliance by Hankins on *Ledbetter* is misplaced, this court will address what it thinks her argument is.

In *Ledbetter*, the Eleventh Circuit dealt with a Title VII claim strikingly similar to Hankins's.  The plaintiff, a female employee at a tire plant, brought a Title VII action alleging that she received a smaller salary than male co-workers.  The defendant employer contended that the majority of her claims were not timely because they were based on discrete events that had occurred outside the limitations period.  The particular issue the court addressed was how Title VII's timely filling requirement applies to instances where an employer has in place a system of annual reviews that re-establishes employee salary levels.  The *Ledbetter* plaintiff's claim was that she could recover to the extent that she could prove intentional discrimination within the framework of the review system.  She argued that because the review process was a practice that covered periods before and during the limitation period, her claims were timely even though based on events occurring more than 180 days before her filing.  The Eleventh Circuit disagreed and held that such a claim was timely only if the intentionally discriminatory salary review "occurred within the limitations period created by her EEOC charge, or at most, the last such decision made immediately preceding the limitations period." *Ledbetter*, 421 F.3d at 1189-90.  Because Title Max does not have a

salary review mechanism in effect, the holding of *Ledbetter* is inapplicable. Therefore, the only timely claim alleged by Hankins is the raise denial that occurred shortly before filing her EEOC.

In evaluating this single claim, this court must resolve two issues. The first is whether plaintiff's declaration stating that her request for a raise occurred before her EEOC filing is sham testimony which is directly contradicted by her previous deposition testimony. The second is whether Hankins states a legally sufficient claim. Although this court does not find Hankins's deposition statements to be sham testimony insofar as applicable to her Title VII claims, summary judgment is nonetheless appropriate because the uncontested facts in this case do not establish a cognizable claim.

This court has already discussed in some detail the legal standards relating to sham testimony and it is discouraged to have to do so again. Even so, there is an apparent inconsistency in Hankins's deposition testimony and her declaration with respect to the denial of her requested raise. As stated earlier, in order to bring suit under Title VII, a plaintiff must file a charge with the EEOC relating to the employer's discriminatory conduct. If conduct occurs after an EEOC charge, it is not covered by that charge and cannot be the basis for suit. It is therefore imperative to Hankins's claim that her conversation with the regional manager, Dave Deal, during which he denied her request for a raise, occurred

before she filed her charge.  In her declaration, she states precisely this: "I asked Dave Deal in the summer of 2004, just prior to my filing an EEOC charge, whether I could have a raise because I was aware than [*sic*] male employees were being paid more money than me.  Deal denied my request for a raise."  According to this account, her claim was timely filed and pursuant to a valid EEOC charge.  Hankins's depositions, however, tell another story.

During her deposition testimony, Hankins was asked about the conversation in which Dave Deal denied her raise request and the following exchange occurred:

> A: . . .  And also brought to his attention my raise, that I never received, that I was told I would receive.
> Q: What was that?  What raise was that?
> A: I was told on three different occasions that I would get a raise.  And never got them.  And then I was told that we had to make sure that – we're going to give you a raise, but we have to make sure that it's not going to affect your EEOC charge.
> Q: Okay.  When did you have this conversation with Dave Deal?
> A: Maybe a month before I was demoted.
> Q: Okay.  It was after you filed the charge, but before you were demoted?
> A: Yes, sir.

Hankins Deposition, at 318-19. This court confesses to being unable to follow the course of this testimony.  Hankins seems to be acknowledging that her conversation with Dave Deal regarding her raise occurred a month before she was demoted, that is to say approximately March, 2005.  If this is the case, it would be in the neighborhood of seven months after the date alleged in her declaration.  Neither party has addressed this ambiguity in any detail.  Because this court must draw all inferences in favor of

the non-moving party, it finds that Hankins's declaration is not fatally inconsistent with her deposition testimony.   Therefore, this court turns to the legal sufficiency of Hankins's claim for the raise denial.

In this circuit, individual disparate pay claims are governed by the familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973) and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089 (1981).   *Ledbetter v. Goodyear Tire and Rubber Company, Inc.*, 421 F.3d 1169 (11th Cir. 2005).   To establish a *prima facie* case of disparate treatment under Title VII, a plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside her protected class more favorably; and (4) she was qualified for the job.   See *Burke-Fowler v. Orange County, Florida*, 447 F.3d 1319, 1322-23 (11th Cir. 2006).   Once all of these elements are shown, the burden shifts to the defendant to establish that the challenged employment practice serves a legitimate, non-discriminatory business objective.   See *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1117 (11th Cir. 1993).   This burden on the defendant is exceedingly light; a defendant need not prove, but only offer non-discriminatory justifications.   *Ledbetter*, 421 F.3d at 1185.   Once a justification is proffered, the burden returns to the plaintiff,

who must establish by a preponderance of the evidence that the defendant had a discriminatory intent. "In other words, the plaintiff must show that a discriminatory reason more likely than not motivated the employer to pay her less." Id. (quoting *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994)). In this the elements and burdens of proof differ under the EPA and Title VII. Id. at 1020 (citing *Tidwell v. Fort Howard Corp.*, 989 F.2d 406, 410-12 (10th Cir. 1993)).

Even assuming that Hankins has made out a *prima facie* claim under Title VII, she has not proven that Title Max had the requisite discriminatory intent. Title Max offered a number of purported justifications for Hankins's allegedly disparate salary. These reasons include race and sex neutral factors such as geographic location, company needs, and comparators's efforts to negotiate a higher wage. Given the "exceedingly light" burden on the defendant in a Title VII case, it falls to Hankins to prove that the proffered justifications are pretextual and that Title Max was motivated by a discriminatory animus. She has made no such showing.

Hankins argues that such factors as Title Max's allegedly conflicting reasons for offering more money to other employees, allegedly telling her that all employees start at $10 per hour, and the scant evidence related to Dave Deal's sexist animus (which has been discussed above) establish the pretextuality of Title Max's

argument.  First, the basis for these allegations is the conclusory
testimony of Hankins herself.  Without any showing of
corroboration, Hankins can not establish pretextuality by a
preponderance of the evidence.  Nor has she addressed the
uncontested fact that a number of protected similarly situated
employees made more than Hankins, who herself made as much or more
than a number of whites and males at each step of employment in
Title Max.  Furthermore, Hankins's own testimony indicates that
Title Max was quick to remedy the grievances she reported.  She was
promoted twice in one year and had the highest base salary of any
store manager.   In short, Hankins has failed to introduce
sufficient evidence to raise a material question on the issue of
pretext.  *Cooper v. Southern Co.*, 390 F.3d 695, 736 (11th Cir.
2004).  Consequently, summary judgment will be granted on her sole
timely Title VII claim.

**D. Retaliation in Violation of Title VII and 42 U.S.C. §1981:**

Hankins also brings retaliation claims under Title VII and 42
U.S.C. § 1981.  In retaliation cases based on circumstantial
evidence, as is the case here, courts use the same analytical
framework set forth in *McDonnell Douglas*.  *Shields v. Florida,* 285
F.3d 1339, 1341 (11th Cir. 2002); *Bernstein v. Emtel, Inc.*, 137
Fed. Appx. 205, 208 (11th Cir. 2005)(quoting *Copper*, 390 F.3d at
724-25).  To establish a prima facie case of retaliation under
Title VII or § 1981, a plaintiff must show: (1) that she engaged in

protected statutory expression; (2) that she suffered adverse employment action; and (3) that there is a causal relationship between the protected expression and the adverse employment action." *Meeks*, at 1021; *EEOC v. Reichhold Chem., Inc.*, 988 F.3d 1564, 1571-72 (11th Cir. 1993).   A plaintiff need not prove the underlying claim of discrimination which led to her protest, so long as she a reasonable belief that the discrimination existed. *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491 (11th Cir. 1989).

As an initial matter, Hankins alleged in her EEOC charge itself, that she was "retaliated" against by being denied promotions.   However, it is unclear what action on her part allegedly induced the retaliation.   Hankins presents no evidence of statutorily protected expression, and therefore any retaliation claims based on events occurring before she filed her EEOC charge are not cognizable. Hankins also claims that her demotion in April, 2005 was in retaliation for her filing the EEOC charge.   This claim, alleging conduct which occurred some 8 months after filing, passes the initial hurdle in establishing a *prima facie* case.

Title Max argues, correctly, that Hankins's only cognizable retaliation claim is brought pursuant to § 1981.   Her Title VII retaliation claim is time barred.   Hankins's retaliation claims arise from the April, 2004 demotion from store manager to assistant manager.   "Each incident of discrimination and retaliatory adverse

employment decision constitute a separate actionable 'unlawful employment practice,'" and "each discriminatory act starts a new clock for filing charges that allege that act." *Benjamin*, 387 F. Supp. 2d at 151-52 (quoting *Morgan*, 536 U.S. at 114). Because Hankins never filed a second EEOC charge relating to the allegedly retaliatory demotion, her Title VII claim is barred.

Title Max argues that because Hankins's Title VII claim is barred, the Supreme Court's decision in *Burlington Northern & Sante Fe Railroad Co.*, 548 U.S. ___, 126 S. Ct. 2405 (2006), which applied to a Title VII claim, should not control this court's determination of which employment acts are "retaliatory." Instead, Title Max argues that this court should follow the Eleventh Circuit's requirement that an adverse employment action must involve "an ultimate employment decision . . . or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee" with respect to § 1981 claims. *Batch v. Jefferson Cty. Child Dev. Council*, 2006 WL 1543776 (11th Cir. 2006).

Under this standard, Title Max contends that because her base salary remained the same after her demotion, and because she worked less hours and earned more money than the employee who replaced her as store manager, Hankins was not subject to an "adverse" employment action. The question of whether a change in an

employee's job or working condition is materially adverse is
usually a question of fact and, as such, can be resolved on summary
judgment only if the question is not fairly contestable. *Williams
v. Bristol-Meyers Squib Co.*, 85 F.3d 270, 273-74 (7th Cir. 1996).
Therefore, even if this court agreed with Title Max's contentions,
it would be inappropriate to grant summary judgment on that basis
alone.  However, this court disagrees with Title Max's argument
that, under the standard enunciated in *Batch*, Hankins suffered no
adverse employment action.  In *Batch*, the Eleventh Circuit
concluded that a lowered performance evaluation did not constitute
a materially adverse employment action because the employee was not
"terminated, *demoted*, or reassigned . . . ."  Id. at *2 (emphasis
added).  In the instant case, Hankins was in fact demoted.
Therefore, it seems clear that even under the standard offered by
Title Max, a demotion constitutes an adverse action.

Title Max also attacks the sufficiency of Hankins's causation
argument.  The causal link element is to be construed broadly, such
that "a plaintiff merely has to prove that the protected activity
and the negative employment action are not completely unrelated."
*Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998).
Even so, Title Max contends that the only proffered basis for
asserting causation is temporal proximity and because the demotion
occurred some eight months after the charge was filed, the acts are
not sufficiently proximate to establish causation.  In this, Title

42

Max is correct.

A plaintiff may establish the causal link element through circumstantial evidence by showing a "close temporal proximity" between the employer's awareness of the protected expression and the initiation of the adverse action. *Shotz v. City of Plantation, Florida*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003) (quoting *Farley v. Nationwide Mut. Ins. Co.*, 197 F. 3d 1322, 1337 (11th Cir. 1999)). Obviously, a precise definition of "close temporal proximity" is elusive. The Eleventh Circuit has held that a period of as much as one month between the protected expression and an adverse action is not too protracted. *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453 (11th Cir. 1998) (quoting *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986)). The Supreme Court has stated that "mere temporal proximity . . . must be *very close*." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511 (2001) (citations omitted) (emphasis added). In *Higdon v. Jackson*, the Eleventh Circuit noted that the Supreme Court has approved of cases in which a three to four month delay was too long to show a causal connection.[7] 393 F.3d 1211, 1220 (11th Cir. 2004). In *Higdon*, the court held that, without more, a three month delay between knowledge of a protected activity and the adverse

---

[7] *Higdon* is a case dealing with retaliation under the provisions of the Americans With Disabilities Act ("ADA"). The same framework governs all retaliation cases arising under the ADA, Title VII, or § 1981. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997).

employment action was not sufficient to establish a causal relationship. Under this standard, it is clear that an eight month lapse is insufficient to establish a causal relationship.

In response, Hankins argues that she is not relying exclusively on temporal proximity to establish causation. However, her arguments show that Hankins has improperly conflated the *prima facie* inquiry into causation with offering evidence to establish pretext. She states that, "In addition to proximity, Hankins has presented evidence that only a few months before her demotion , her direct supervisor, Lewis, wanted to give her a raise."  Whether this is true or not is irrelevant to the *prima facie* inquiry.  If anything, it might be relevant to showing pretext, but it has no bearing on the causal link between the protected expression and the adverse action.  Hankins, however, is not done.  She continues:

> "Moreover, it is undisputed that Hankins grew her store quickly. The defendant contends that she had performance problems; however, the defendant did not demote other store managers who had much worse performance issues such as Gerrard Dial.  Defendant's contention that she was regularly absent is without merit when the testimony is that she missed a few days due to a serious infection. Moreover, shortly after she was demoted to the Green Springs location, she was sent to the Hoover location where her bonuses would be smaller for no apparent reason."

Again, these facts are not relevant as evidence of causation.  Were Title Max to proffer justifications for its conduct, this court might consider these facts as evidence of pretextuality.  However, because Hankins offers no causation evidence other than temporal proximity, and because her temporal proximity argument is based on an impermissibly long period between her expression and the

44

allegedly adverse employment decision, Hankins has not met her burden to establish a *prima face* case for retaliation under § 1981. Therefore, summary judgement is due to be granted on this claim.

### III. Conclusion

For the reasons given above, the court agrees in part with Title Max and will grant its motion for summary judgment in part and deny the motion in part by a separate order.

DONE this 26th day of September, 2006.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

45